IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:20-CV-459-RJ

| | |
|---|---|
| JAMES DAVIS,<br><br>    Plaintiff/Claimant,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | O R D E R |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-18, -20] pursuant to Fed. R. Civ. P. 12(c). Claimant James Davis ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, Claimant's Motion for Judgment on the Pleadings is allowed, Defendant's Motion for Judgment on the Pleadings is denied, and the case is remanded for further proceedings consistent with this order.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on December 22, 2017, alleging disability beginning December 2, 2017. (R. 15, 206–11). His claim was denied initially and upon reconsideration. (R. 15, 78–93). A hearing before the Administrative Law Judge ("ALJ") was held on October 7, 2019, at which Claimant, represented by a non-attorney, and a vocational expert ("VE") appeared and testified. (R. 31–77). On November 19, 2019, the ALJ issued a decision

denying Claimant's request for benefits. (R. 12–30). On June 22, 2020, the Appeals Council denied Claimant's request for review. (R. 1–6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

Case 5:20-cv-00459-RJ   Document 22   Filed 02/22/22   Page 2 of 13

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 416.920a(e)(3).

In this case, Claimant alleges the ALJ erred by failing to perform a proper function-by-function assessment of Claimant's ability to stand and walk. Pl.'s Mem. [DE-19] at 5–9.

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial

3

gainful activity since December 22, 2017, the application date. (R. 17). Next, the ALJ determined Claimant had the following severe impairments: right shoulder tendonitis and osteoarthritis, chronic heart failure, non-ischemic cardiomyopathy, hypertension, pulmonary hypertension, left internal carotid artery occlusion, Stokes-Adams syncope, diabetes mellitus, seizures, and residual effects of strokes. *Id.* The ALJ also found Claimant's hyperlipidemia, Vitamin D deficiency, gynecomastia, acute kidney failure, hypo-osmolality, hyponatremia, and unspecified convulsions were either not medically determinable, did not meet the twelve month-duration requirement, or were not severe.[1] (R. 17–18). At step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18–19).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[2] with the following limitations:

> stand/walk about 4 hours in an 8-hour workday with normal breaks; occasionally push/pull and operate foot controls with the right lower extremity; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently reach overhead bilaterally; occasional exposure to extreme heat and vibration; occasional exposure to pulmonary irritants such as dust, odors, fumes, and gases and to poorly ventilated areas; no exposure to unprotected heights; occasional exposure to hazardous machinery or hazardous moving mechanical parts; and no driving or operating motor vehicles. Claimant is limited to jobs that can be performed while using a handheld assistive device, a cane, required at all times when walking and the contralateral upper extremity could

---

[1] Impairments that are "not severe," unlike impairments that are "not medically determinable," must still be considered in evaluating a claimant's RFC. *See* 20 C.F.R. § 416.945(a)(2). On remand, the ALJ should distinguish between impairments that are "not severe" and "not medically determinable" so that the court is not left to guess at the ALJ's step two findings and so the court can conduct a meaningful review of the step two and RFC determinations.

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 416.967(b).

4

be used to lift and carry up to exertional limits. Claimant's work is limited to simple, routine and repetitive tasks, but not a production rate pace. He would be off task no more than 10 percent of the time in an eight-hour workday, in addition to normal breaks (with normal breaks defined as a 15 minute morning and afternoon break and a 30 minute lunch break).

(R. 19–24).[3] In making this assessment, the ALJ found Claimant's statements about his limitations to be not entirely consistent with the medical evidence and other evidence in the record. (R. 20–21).

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as a warehouse worker. (R. 24). Nonetheless, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 25).

## V. DISCUSSION

Claimant contends the ALJ erred by failing to perform a proper function-by-function assessment of his ability to stand and walk when formulating the RFC; specifically, Claimant's heart failure and stroke have resulted in his significant difficulty standing and walking, and the ALJ failed to explain how he concluded Claimant can stand or walk for four hours in an eight-hour workday. Pl.'s Mem. [DE-19] at 5–9. Defendant argues the ALJ properly assessed Claimant's RFC by fully considering his impairments and accounting for his limitations in the RFC. Def.'s Mem. [DE-31] at 7–13.

"[T]he residual functional capacity 'assessment must first identify the individual's

---

[3] In the case of *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019), the Fourth Circuit determined that an RFC precluding a claimant from performing work "requiring a production rate or demand pace" did not provide enough information to understand what those terms meant and to assess whether their inclusion in the RFC addressed the claimant's limitations. 916 F.3d at 312. On remand, the ALJ should explain what is meant by "not a production rate pace."

5

functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting S.S.R. 96-8p). "Only after such a function-by-function analysis may an ALJ express RFC 'in terms of the exertional levels of work.'" *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (quoting *Mascio*, 780 F.3d at 636); *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion"). However, the Fourth Circuit has rejected "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." *Mascio*, 780 F.3d at 636. Rather, the court explained that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (citation omitted). Therefore, despite an ALJ's failure to conduct the function-by-function analysis, the court must look to the ALJ's RFC discussion to determine whether it otherwise provides a sufficient basis for meaningful review.

The ALJ did not perform a function-by-function assessment of Claimant's ability to stand and walk in formulating the RFC. (R. 19–24). The ALJ summarized Claimant's hearing testimony, including that he was unable to sit for long before his right leg started to hurt; he used a cane in his right hand since his stroke; he could stand for about fifteen minutes and walk a block when trying to exercise but had to rest for five to ten minutes every 100 feet due to shortness of breath and sweating; he wore an uncomfortable brace to stabilize his foot to help him walk, he was unable

6

to walk much without it, and at times (once or twice a day) his right leg would swell such that he could not wear the brace; and he had to sit on a chair in the shower, was unable to stand and wash dishes, and was unable to grocery shop due to his right leg pain and weakness. (R. 20). Next, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence of record. (R. 21). Finally, the ALJ went on to summarize the treatment notes, asses the state agency consultants' opinions, and conclude as follows:

> In sum, the record documents that claimant suffers from impairments, which singly or in combination do cause certain limitations. However, the record does not establish that the claimant's limitations are disabling. The above residual functional capacity is supported by the objective medical evidence, to include imaging and laboratory test results and physical examinations, the treatment notes, and the other evidence of record, to include the claimant's activities of daily living. The claimant's impairments, including his cardiovascular and neurological conditions, are fully accommodated by limiting him to a reduced range of unskilled, non-production rate pace, light work, with stand/walk, push/pull, postural, manipulative, and environmental restrictions, use of a cane, and an allowance for time off task.

(R. 21–24).

Defendant contends the ALJ's decision demonstrates a thorough analysis of the evidence of record, including how that evidence supports the ALJ's specific findings. Def.'s Mem. [DE-21] at 8. The ALJ provided a recitation rather than an analysis of the evidence, (R. 21–24), and the ALJ's summary conclusion cites only general categories rather than specific evidence supporting his conclusions. *See Mascio*, 780 F.3d at 636 ("the residual functional capacity 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'") (citing S.R.R. 96-8-p). Furthermore, nowhere does the ALJ explain which of

7

Claimant's statements he chose to believe and which to discredit.[4] *See id.* at 640 (finding the ALJ's lack of explanation required remand where the decision lacked explanation of how he decided which statements to believe and which to discredit). The ALJ did not explain how he arrived at the conclusion that Claimant could walk and stand for four hours in an eight hour workday. *Thomas*, 916 F. 3d at 311 (explaining that a proper RFC analysis contains a "logical explanation" connecting the evidence to the conclusion) (citing *Woods v. Berryhill*, 888 F.3d 686 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176 (4th Cir. 2016); and *Mascio*, 780 F.3d at 632)). Here, the ALJ's error frustrates meaningful review and requires remand because there is evidence in the record arguably supportive of Claimant's testimony regarding his limitations.

The ALJ discussed records demonstrating that Claimant presented at the emergency department on December 2, 2017 with shortness of breath on exertion, cough, and orthopnea; a CT scan showed congestive heart failure and an echocardiogram showed an ejection fraction of less than 20%; he was also diagnosed with pneumonia; and he was treated with medications, fitted with a Live Vest, and designated as New York Heart Association ("NYHA") Class III upon discharge.[5] (R. 21, 271–327). At a December 15, 2017 follow up with a cardiologist, it was noted that Claimant had severe left ventricular systolic dysfunction and severe pulmonary hypertension, he clinically felt much improved, and he was designated NYHA Class II, which is characterized

---

[4] For example, in evaluating the state agency medical consultants' opinions, the ALJ found the opinions were "not completely consistent with the complete record, to include the claimant's testimony, which supports that claimant is more limited." (R. 24). Thus, the ALJ did not completely discredit Claimant's statements, but it is unclear how the ALJ credited the Claimant's testimony.

[5] Under the NYHA classification guidelines, doctors classify a patient's heart failure according to the severity of symptoms on a scale of I to IV, with IV being the most severe, and Class III is characterized by marked limitation of physical activity, being comfortable at rest, and less than ordinary physical activity resulting in fatigue, palpitation, and dyspnea (shortness of breath). *See* Classes of Heart Failure, Am. Heart Ass'n, https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure; *see also Thomas v. Saul*, No. 3:18-CV-700 (JAG), 2019 WL 3801850, at *10 (E.D. Va. July 25, 2019), *report and recommendation adopted*, 2019 WL 3779515 (E.D. Va. Aug. 12, 2019).

by a slight limitation of physical activity, being comfortable at rest, and ordinary physical activity resulting in fatigue, palpitation, and dyspnea (shortness of breath), *see* Classes of Heart Failure, Am. Heart Ass'n, https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure. (R. 21, 333–37). Claimant reported at his follow-up cardiology appointment on February 5, 2018 that he was experiencing some dizziness upon rising from sleep and numbness in his fingertips, but he overall remained stable, he remained NYHA Class II, and his medications were adjusted. (R. 21, 359–63).

Claimant presented to the emergency department on September 22, 2018, with increasing weakness involving the right lower extremity to the point he was dragging his leg and fell because his leg was so weak. (R. 22, 384). An MRI confirmed Claimant had a stroke, and he was placed on medication and recommended for inpatient rehabilitation. (R. 22, 402–03). Claimant's neurological examination showed improved strength up to 4/5 in his right lower extremity prior to discharge. (R. 22, 403). Claimant was discharged from the emergency department and admitted to inpatient rehabilitation on September 25, with ADL and gait deficits noted as difficulty walking and generalized deconditioning/weakness. (R. 572–78). Claimant was discharged from rehabilitation on October 8 and was noted to be using an "AFO" or boot on his right lower extremity, he had reciprocal gait pattern, mild cognitive and communicative deficits were noted, and for ADLs he was "[i]ndependent for eating and modified independent for all other self care," and "[m]odified independent for toilet transfers to elevated commode and distant supervision for shower transfers to appropriate equipment." (R. 581). Claimant reported to his primary care provider on October 12, 2018, that he had been doing well and his physical, occupational, and speech therapy were going well. (R. 22, 365).

Additional cardiology follow-up visits in October and November 2018 were unremarkable,

9

Claimant reported doing fairly well with no ongoing symptoms, he continued to have numbness in his fingertips but his strength has improved, and he remained NYHA Class II. (R. 22, 511–29). At Claimant's annual physical exam in December, he complained of intermittent pain on the bottom and top of his right foot, but his gait was normal. (R. 22, 370–71). At a March 2019, visit, Claimant had right shoulder pain and was diagnosed with tendonitis, but his lower extremity motor strength was normal. (R. 22–23, 373–74).

On May 3, 2019, Claimant presented to the emergency department after experiencing a seizure lasting four to five minutes. (R. 23, 635). Claimant experienced a shorter seizure at the hospital during a CT scan, an MRI showed a focal acute infarct in the left frontal lobe and an acute infarct in the genu of the corpus callosum, and Claimant was admitted to the hospital. (R. 23, 638–41). Claimant was discharged on May 7, with a diagnosis of seizure as a late effect of his stroke (in addition to his diagnoses of congestive heart failure, essential hypertension, CVA or stroke, and Stokes-Adams syncope), his medications were continued, and he received a Holter monitor to monitor his heart post-discharge. (R. 23, 648–51). At a follow-up with cardiology on May 17, Claimant was doing "reasonably well," he denied any "active symptoms," he was able to "get around fairly well," and he remained NYHA Class II for heart failure. (R. 23, 724–32).

Claimant was seen by his primary care physician in June, July, and August 2019. (R. 23, 788–96). In June, Claimant had no remarkable concerns and felt generally healthy, (R. 794); in July, he reported his blood sugar was well-controlled, and he was feeling well, (R. 791); and in August, no problems were noted, (R. 788).

On September 12, 2019, Claimant was seen by neurology for a consultation in follow-up from his stroke and seizure. (R. 23–24, 797–801). It was noted that "[s]ince discharge he has done well. He now walks with a cane and has some STM problems but feels like he has recovered well.

10

He has not had any further seizures. He is tolerating all of his medications." (R. 23, 797). Right sided weakness was noted in the review of symptoms, and on examination he demonstrated normal lower extremity strength, pronator drift on the right side, ataxic gait, dysmetria on right finger-to-nose testing, and dysdiadochokinesia. (R. 23–24, 798–99).

There is evidence in the treatment notes that would tend to support Claimant's testimony that, due to his cardiovascular and neurological impairments, he is more limited in his ability to stand and walk than the ALJ determined. As discussed above, the treatment notes indicate Claimant's congestive heart failure was consistently rated as NYHA Class II, which is characterized by being comfortable at rest but ordinary physical activity resulting in fatigue, palpitation, and dyspnea (shortness of breath); Claimant experienced right side weakness associated with his stroke; Claimant used of a cane and exhibited gait disturbance; and Claimant's daily activities were limited. While there is also evidence in the record that could arguably support the ALJ's decision, the "depth and ambivalence" of the medical record in this case precludes the court from undertaking a "meaningful review," where the ALJ failed to explain both how he evaluated Claimant's subjective statements and his reasoning regarding the standing and walking limitations in the RFC. *See Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013); *see also Monroe*, 826 F.3d at 188 ("[R]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review," quoting *Mascio*, 780 F. 3d at 636, and "[o]n remand, the ALJ should assess [the claimant's] credibility in the context of the function-by-function analysis of the limitations caused by [the claimant's] impairments, which the ALJ will then use to determine [the claimant's] RFC.").

The Defendant suggests that Claimant's medication non-compliance in September 2018

was the reason his symptoms worsened and that Claimant's symptoms improved when he took his medications. Def.'s Mem. [DE-21] at 9–10. First, neither Defendant nor the ALJ addressed Claimant's stated inability to afford his medications as a reason for non-compliance. Claimant told his cardiologist in November 2018 that at the time of his September 2018 hospitalization "he hadn't been taking his HTN medication for 3 weeks prior to this episode due to cost," and that "his Medicaid has since been adjusted so he can afford his medications more easily." (R. 511); *see* S.S.R. 16-3p, 2016 WL 1119029, at *10 (March 16, 2016); *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984) ("It flies in the face of patent purposes of the SSA to deny benefits to someone because he is too poor to obtain medical treatment that may help him" ); *McKoy v. Saul*, No. 7:19-CV-223-FL, 2020 WL 8084961, at *9 (E.D.N.C. Nov. 22, 2020) ("citing McKoy's non-compliance, without exploring the reasons underlying it, offers little in the way of substantial evidence to support ALJ Moldafsky's assessment"), *adopted by* 2021 WL 76956 (E.D.N.C. Jan. 8, 2021). Second, Claimant continued to experience symptoms such as right sided weakness, pronator drift on the right side, ataxic gait, dysmetria on right finger-to-nose testing, and dysdiadochokinesia in September 2019, well after the noted medication non-compliance. (R. 798–99). Furthermore, the fact that Claimant's most serious conditions improved with medication does not necessarily mean that he is able to perform competitive work at the RFC determined by the ALJ, and the ALJ did not sufficiently explain that determination. Finally, the ALJ did not offer this reasoning in support of his decision, and the court cannot substitute Defendant's explanation for one not given by the ALJ. *See Cumbee v. Kijakazi*, No. 7:20-CV-59-FL, 2021 WL 4447625, at *4 (E.D.N.C. Sept. 28, 2021) ("[H]owever meritorious [the Commissioner's suggested] rationale might be, acceptance of such an unclearly stated but ostensibly implicit rationale would constitute 'post-hoc justification.'") (citing *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 109 (4th Cir. 2020); *Radford*, 734 F.3d at

296).

The ALJ's RFC determination lacks sufficient explanation for the court to conduct a meaningful review, and accordingly, this case is remanded to the Commissioner for further proceedings consistent with this order. The court expresses no opinion on the outcome of the claim on remand.

## VI. CONCLUSION

For the reasons stated above, Claimant's Motion for Judgment on the Pleadings [DE-18] is ALLOWED, Defendant's Motion for Judgment on the Pleadings [DE-20] is DENIED, and this case is remanded to the Commissioner, pursuant to sentence four of § 405(g), for further proceedings consistent with this order.

So ordered, this the 22nd day of February 2022.

Robert B. Jones, Jr.
United States Magistrate Judge